# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | 63RD FLOOR
NEW YORK, NEW YORK 10118
TEL (212) 763-0883 | FAX (212) 564-0883
WWW.KAPLANHECKER.COM

DIRECT DIAL    929.294.2540
DIRECT EMAIL   jdabbs@kaplanhecker.com

April 24, 2024

**VIA ECF**
The Honorable Loretta A. Preska
United States District Court
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007-1312

> Re:     *United States of America v. Aboudulaye Keita et al., 1:22-cr-435 (LAP)*

Dear Judge Preska:

We respectfully submit this memorandum on behalf of Aboudulaye Keita, in connection with his sentencing, which is scheduled to take place on May 8, 2024, at 12:00 p.m. Mr. Keita is a 24-year-old young man and father of a young son he has not seen since his arrest, initially by the state, on July 13, 2022. He stands before the Court convicted of participating in a very serious offense that involved purchasing firearms in Arkansas, where Mr. Keita grew up and has lived for many years, and facilitating the transport of those firearms to New York for resale. While it is not difficult to identify numerous contributing factors to the circumstances in which Mr. Keita now finds himself—including the absence of his father in his life during his formative years, physical abuse during his childhood that went unreported and unaddressed, pressures to contribute financially to his family, mental challenges that made holding a steady job difficult, and neighborhood and cultural influences that exposed him to and glamorized firearms—Mr. Keita understands the severity of his conduct and that he ultimately has no one to blame but himself for his extremely poor decisions.

Mr. Keita deeply regrets his involvement in this offense. Consistent with that, and consistent with his recognition of both the severity of his conduct and his desire to accept responsibility for his actions and embark on a path forward, Mr. Keita very quickly took responsibility for his conduct by entering a guilty plea on February 1, 2024. And he has already paid a heavy price. Incarcerated a great distance from the majority of his family members, and particularly those with whom he is closest, Mr. Keita has not seen any member of his family since his arrest in 2022. He has missed out on the very first years of his two-year-old son's life. He has served nearly two years at the Metropolitan Detention Center, which has been plagued during that time by staffing challenges that have led to near-constant lockdowns, appalling and dangerous conditions, and a lack of the most basic amenities.

KAPLAN HECKER & FINK LLP

As someone with no prior convictions, and very limited prior interactions with the criminal justice system, Mr. Keita has had a very hard time since his arrest and at the MDC in particular. His first ever period of incarceration has given him meaningful time to reflect on his choices, it has matured him, and it has left him determined to avoid ever being in this situation again. We respectfully submit that a sentence of 24 months, modestly below the applicable advisory Sentencing Guidelines range, would be both appropriate and adequate to accomplish the aims of sentencing outlined in Title 18, United States Code, Section 3553, given Mr. Keita's young age and status as a first-time offender, his detention at MDC, where he has been very meaningfully separated from his family in Arkansas, and where he has experienced extremely harsh conditions of confinement over an extended period, along with other factors that support the conclusion that he is unlikely to recidivate. These considerations and others, described in more detail below, counsel strongly in favor of a sentence of no more than 24 months.

## I.      Background

### A.  Mr. Keita's Childhood

Mr. Keita was born in the Bronx in 2000, to Mohamed Keita and Bintou Sangare. Mr. Keita, 54, is now a livery cab driver in New York, still residing in the Bronx, while his mother, 42, is a cosmetologist currently residing in Tennessee. Ms. Sangare was only 19 years old when Mr. Keita was born, and she had a challenging relationship with Mr. Keita's family, which ultimately led to his parents separating when Mr. Keita was just a toddler. Ms. Sangare, an immigrant with limited ties in the United States, relocated her young family, which consisted of three young children, to Arkansas, where she had a dear friend from home. Mr. Keita's father was not present in his daily life and communicated minimally, leaving it to Mr. Keita's mother to take on the primary responsibility of rearing and supporting her children, although he did provide some financial support.

In their new home in Arkansas, Ms. Sangare began working long days to support her family. Although she worked very hard to be able to provide the basic necessities, the family did not have much, and Mr. Keita grew up in a difficult neighborhood, particularly for young men, where violence and guns were commonplace. On one occasion, while Mr. Keita and his siblings were home, multiple bullets flew through their house, the byproduct of some fighting between neighborhood gangs. Since his mother was often busy with work, it fell to Mr. Keita to look after his siblings in her absence, and he also worked "off the books" jobs, such as lawn mowing and car washing, to support his family while in school.

As he grew up, Mr. Keita would occasionally visit his father in New York, where he was exposed to his father's family, which had caused substantial turmoil for his mother and, by extension, for Mr. Keita and his young siblings. Among them was his paternal uncle, who physically assaulted Mr. Keita on multiple occasions. One time, he struck Mr. Keita in the face and made him get into a scalding hot shower, where he proceeded to strike Mr. Keita with an X-Box cord. On another occasion, he shoved Mr. Keita, who was just a child, so hard that he broke his arm. Afraid that his father would not believe or support him, Mr. Keita did not tell anyone the truth of what had happened and at whose hand.

KAPLAN HECKER & FINK LLP

Amidst the difficult circumstances of his childhood, and the emotionally devastating effects of his abuse, Mr. Keita started smoking marijuana when he was 13 years old. He was an average student at school, where he struggled because of his untreated ADHD,[1] and he found the most joy in basketball and music. He started writing and producing his own music, sharing it on TikTok, YouTube, and Instagram. He dreamed of one day becoming a successful artist.

No one in Mr. Keita's immediate family has gone to college. His parents did not even graduate high school. Mr. Keita's high school graduation, from Wilbur D. Mills University Studies High School in Little Rock, was a first in his immediate family. Following his graduation, he worked as a stock associate for Walmart in Little Rock for seven months, where he made minimum wage. He then worked in manufacturing at a factory for Welspun Tubular, a manufacturer of pipes for the oil and gas industry. He struggled with the demanding 6 am – 6 pm shifts, and the inflexible routine, especially when he saw his peers in far less demanding jobs making more money than him on the streets. He ultimately quit after approximately half a year of working there. Mr. Keita held other jobs over the subsequent two to three years, but he consistently experienced executive functioning and attention challenges that made steady employment elusive.

When he is released after serving the sentence imposed by the Court, Mr. Keita is eager to explore full time employment opportunities in construction, or a related trade such as electrical work, and to consider potential treatment options for his ADHD in support of that goal. His sole focus is on making up for the time he has lost with his young son, being a meaningful presence in his life, and supporting him and serving as a mentor and role model—the sort of father he did not have growing up because of the distance between his parents.

### B. *Mr. Keita's Social Ties, Support System, and Contributions to his Family*

Mr. Keita shares an extremely close and loving relationship with each of his siblings, as well as his mother. No one in his family has gotten into trouble with the law before, and they are all extremely distressed by Mr. Keita's actions, but committed to supporting him as he gets his life back on track. As evidenced by the letters attached to this submission, those who know Mr. Keita describe him as "kind," "loving," "goofy" and "good-hearted," someone whose "family is his biggest concern." Ex. A; Ex. B at 1; Ex. D. Mr. Keita's little sister recounts how much she loves her brother, and how she has always looked up to him. Ex. A. She describes how Mr. Keita protected her and helped raise her when their mom had to be out working to support them. He was "always by [her] side to ensure her safety," and "always looked out for [her]," doing so while "smil[ing]" and "laugh[ing]." *Id.* She regrets that Mr. Keita fell in with the "wrong people," and "firmly believe[s] in [her] brother's potential for growth." *Id.* It is Mr. Keita's dream to be able to attend her high school graduation next year, and to become the man his sister knows he can be.

Mr. Keita's mother, Ms. Sangare, shares how she could always rely on Mr. Keita to do what she asked and watch over his siblings, and how Mr. Keita did his best, from the time he was a young child, to support their family however he could. Ex. B at 1. She recounts the joy Mr. Keita would get out of staging "surprises" for his mother by buying food and supplies for the house with

---

[1] Mr. Keita was diagnosed with ADHD in elementary school. However, his mother did not want him taking any medication, nor did she support mental health treatment, so his condition went entirely untreated.

**KAPLAN HECKER & FINK LLP**

his income. *Id.* Mr. Keita's father states that "there is no one to blame . . . but [himself]" for the challenging childhood his son had, when there was "never enough to provide for all the family," and he "faced a great pressure being the oldest." Ex. C. Mr. Keita's girlfriend, and the mother of his son, shares how Mr. Keita is a "wonderful father" despite the challenges he has faced in life. Ex. D. She elaborates on how Mr. Keita has faithfully done his best to stay in touch while in jail, so his son can feel his presence even from far away. *Id.*

Given the strength of these relationships, and the impact Mr. Keita has on the lives of those closest to him, his arrest and detention has caused tremendous strain on the people who depend on him. Mr. Keita's actions, and his consequent incarceration, have been "nothing but stressful and heartbreaking" for his mother, who has had an extremely hard time, as have Mr. Keita's siblings. Ex. B at 1-2. His sister, now 17, misses him constantly, and worries about how scary prison is for her brother. Ex. A. She "understand[s] what he did was terrible," but believes he "regrets this" and wants him to "have another chance to learn from his mistake." *Id.* His girlfriend hates that her son is growing up without his father present and knows that Mr. Keita "is going to do great by sticking to what is right and making up for the time lost with his son" when he gets out of jail. Ex. D. Mr. Keita is fully aware of, and deeply regrets, the pain that his actions have caused and continue to cause his family members and loved ones.

## II.     Nature and Circumstances of the Offense

The offense conduct in this case was unquestionably serious, and consisted of Mr. Keita working with others to purchase firearms in Arkansas and transport them to New York. *See* PSR Report at 11. Although the Government has tried to cast Mr. Keita as the mastermind of the operation, he was a middleman in the offense, working at the behest of purchasers in New York who directed his work. *See* Sealed Compl. as to Jailyn Hillard, ¶ 8(d) (attesting that the firearms purchased "really [weren't]" for Mr. Keita, that they were "not his to keep" and that he is "sort of a middleman").

Mr. Keita was arrested on November 2, 2022, following the arrests of co-defendants Marquise Austin, Cedric Christopher, and Jailyn Hilliard. *See USA v. Keita et al*, Docket No. 1:22-cr-00435 (S.D.N.Y.). On February 1, 2024, Mr. Keita entered a plea of guilty to Count One of the Indictment, which charged him with participating in a conspiracy to traffic firearms. *See id.* At his change of plea hearing, Mr. Keita accepted full responsibility for his participation in the charged conspiracy and apologized for his role in the offense. *See* Feb. 1, 2024 Tr., ECF 111 at 12.

Mr. Keita fully owns up to his conduct and regrets the very poor choices that he made. The environment and culture he grew up in were ones in which firearms were far more normalized than they are in New York, and access to guns far less regulated. Arkansas is among the top states measured by guns per capita in the United States, with ~57% of adults owning a gun. *See* Ali Ahmed, *20 States with Most Guns Per Capita*, Yahoo Finance (Aug. 21, 2023), https://finance.yahoo.com/news/20-states-most-guns-per-203058058.html (listing Arkansas as sixth in guns per capita); Christina Capatides, *How heavily armed is your state?*, CBS News (Dec. 4, 2015), https://www.cbsnews.com/pictures/most-heavily-armed-states-in-america/ (listing Arkansas as the third most heavily armed state in America).

KAPLAN HECKER & FINK LLP

Mr. Keita grew up in a poor neighborhood in Little Rock where guns were common, particularly among young men. Indeed, Little Rock is among the most unsafe cities in America. *See* Brian Entin, *Little Rock, Arkansas among nation's most dangerous cities*, News Nation (Aug. 1, 2023), https://www.newsnationnow.com/crime/little-rock-arkansas-among-nations-most-dangerous-cities/; *Little Rock, AR Crime Rates*, Neighborhood Scout, https://www.neighborhoodscout .com/ar/little-rock/crime#description ("With a crime rate of 72 per one thousand residents, Little Rock has one of the highest crime rates in America compared to all communities of all sizes – from the smallest towns to the very largest cities. One's chance of becoming a victim of either violent or property crime here is one in 14."); Alix Martichoux, *Little Rock, North Little Rock & Pine Bluff ranked among most dangerous cities and towns in the US, study finds*, Kark (Dec. 22, 2023), https://www.kark.com/news/national-news/little-rock-north-little-rock-pine-bluff-ranked-among-most-dangerous-cities-and-towns-in-the-us-study-finds/ (rating Little Rock seventh nationally in crime cost per capita).

Access to guns was routine, and an accepted part of everyday life. Mr. Keita was conscious of the risk this posed, since he and his younger siblings were in the house alone on one occasion when they were caught—while inside their home—in the crossfire of a gun fight, permanently challenging their sense of safety. The rounds were likely meant for the trap house, a location for narcotics sales and other gang activity, right next door to Mr. Keita's childhood home, which was eventually raided by the authorities and consequently demolished. In this culture, Mr. Keita felt that owning a gun represented control, and made you look less vulnerable.

None of this excuses Mr. Keita's behavior, but it explains the circumstances and backdrop against which his crime was committed. When he first started engaging in the offense conduct, Mr. Keita did not fully understand, as he does now, the severity of his actions. Nor did he, rather naively, fathom that the guns might be used to hurt someone—Mr. Keita himself frequently used guns as accessories for his music videos, and he was used to seeing them around. However, he has never himself been part of a gang nor has he participated directly in any gun related violence. Accordingly, he did not fully contemplate the full range of possible outcomes of his actions, which he now understands and for which he is deeply sorry.

## III.    Mr. Keita's Incarceration at the MDC

Mr. Keita was transferred from state to federal custody on November 2, 2022, and he has been detained at the MDC since December 7, 2022. ECF 46.[2] At the MDC, isolated from his family in Arkansas, Mr. Keita has done his best to keep his head down and stay out of trouble. His track

---

[2] A writ of *habeas corpus ad prosequendum* was issued for the defendant's transfer into federal custody on August 12, 2022. Because of a delay in the transfer process, the defendant remained in state custody at Pulaski County Regional Detention Facility in Little Rock, Arkansas ("Pulaski") until he posted bond on the state charges on or about November 2, 2022, at which point the state relinquished primary custody and he began to be held on the federal detainer. Gov't Letter, ECF 46 at 2 fn.6.

KAPLAN HECKER & FINK LLP

record has not been perfect, but it is consistent with a young man for whom time management and executive functioning remain challenging. Mr. Keita's Pre-Sentence Investigation Report ("PSR") reports three occurrences of disciplinary infractions over the seventeen months he has been at MDC. PSR at 5. Two of these are minor, and one is a case of mistaken identity which Mr. Keita is in the process of appealing. The first instance, on June 9, 2023, involved Mr. Keita failing to put on his jumpsuit to start the morning as required by standing rules at the institution. Mr. Keita had observed several other inmates do the same previously, without any objection by the supervising Corrections Officers. However, the CO that morning took issue with Mr. Keita's violation of the dress code and wrote him up. The third instance was on March 13, 2024. Mr. Keita was getting food when "recall" was initiated, *i.e.*, inmates were required to immediately report to their cells. Mr. Keita sprinted back, but just as he was approaching his cell, the guard on duty saw him coming and closed the door in his face, leading to him being in an "unauthorized area," *i.e.*, right outside his cell, when he should have been inside for recall.

The second instance, on June 13, 2023, involved Mr. Keita being mistaken for another tall, black inmate by an MDC doctor who said the inmate had prevented the doctor from pursuing a fellow inmate. Mr. Keita was asleep in his cell the entire time, as both he and his cellmate told the MDC officers. At his hearing, Mr. Keita urged the Discipline Hearing Officer ("DHO") to speak to his cellmate and look at footage from the camera right outside his cell to confirm. However, the DHO refused, and relied only on footage of the incident itself, which he admitted to Mr. Keita was blurry, and revealed only three tall Black men blocking the doorway. This appeal remains pending.

While at the MDC, apart from doing his best to comply with the sometimes randomly enforced rules and protocols, Mr. Keita has been subject to unconscionable conditions of incarceration. Mr. Keita's time at the MDC has been plagued by "perpetual lockdowns (no longer explained by COVID-19)." *United States v. Chavez*, No. 22-CR-303 (JMF), 2024 WL 50233, at *1 (S.D.N.Y. Jan. 4, 2024); *see also id.* at *5 ("As of the date of this Opinion and Order, inmates at the MDC have reportedly been on lockdown for much or all of the last three weeks following an assault on staff, with a maximum of 'two hours outside their cells each day' during a short reprieve."). For a young man used to being surrounded by friends and family, the lockdowns have taken a particularly heavy toll on Mr. Keita. *See id.* (finding that the MDC's recent and frequent use of lockdowns is, "for at least some inmates, tantamount to solitary or near-solitary confinement, a practice that is increasingly viewed as inhumane"). In several instances, 24-hour lockdowns were instituted on consecutive days.

These circumstances have been exacerbated by the "dreadful conditions" otherwise at the MDC. *Id.* at *1. Mr. Keita has repeatedly had to go as long as five days without being able to take a shower, and then had to wait hours to get one. He has had to make do at times without toilet paper and a toothbrush. He has observed dead rats being served in inmates' food and endured entirely irregular mealtimes. He has lived side by side with the fungus growing along the walls of his cell. With his close family members all in Arkansas, Mr. Keita has not had a single visitor to the MDC over his seventeen months of incarceration there. He has not seen his 2-year-old son since he was about six months old. Between the lockdowns, the conditions at the MDC, and the isolation from his family, Mr. Keita's incarceration has been the hardest of time.

Despite these adverse circumstances, and as evidence of his character, resilience, and determination to move forward from this chapter in his life, Mr. Keita has used his time at MDC

KAPLAN HECKER & FINK LLP

to improve himself. He has taken a course in chess and participated in organized physical fitness activities at the MDC. PSR at 6. He has been reading books on parenting, economics, construction, and real estate. Mr. Keita is committed to doing everything in his power to get his life back on track, and to be able to support his family when he is released. To that end, he has been learning about construction and electrical work, to explore the careers he could have in those fields through the books he has read while at MDC.

IV.     **A Modestly Below-Guidelines Sentence is Sufficient to Accomplish the Statutory Objectives of Sentencing**

We respectfully submit that the sentencing factors set forth in 18 U.S.C. § 3553(a) support a sentence for Mr. Keita of no more than 24 months' incarceration.

As the Court is aware, the Sentencing Guidelines are "*not mandatory* on sentencing courts" and are "also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original). In imposing a sentence, courts are required to consider the factors set forth in 18 U.S.C. § 3553(a) to create an "individualized assessment" based on a defendant's particular circumstances. *Gall v. United States*, 552 U.S. 38, 49-50 (2007). "A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc).

A Court must impose a sentence below the range recommended by the Guidelines if such a sentence would satisfy the purposes of § 3553(a). *See, e.g.*, *United States v. Dorvee*, 616 F.3d 174, 183-84 (2d Cir. 2010); *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006). It is the Court's responsibility to impose a "sentence sufficient, but not greater than necessary" to satisfy the statutory purposes of sentencing. 18 U.S.C. § 3553(a).

Given the duration and nature of Mr. Keita's detention at the MDC, his role as a middleman in the offense, and his personal history and characteristics, a modestly below-Guidelines sentence would most appropriately "reflect the seriousness of the offense" while meeting the requirements "to provide just punishment," "avoid unwarranted sentencing disparities," and "afford adequate deterrence." *Id.*

A.   ***Mr. Keita has Already Been Detained for Seventeen Months in Federal Custody on Near Constant Lockdown and Subjected to Abhorrent Conditions***

The nature of Mr. Keita's detention pending resolution of this case has been severely punitive. As discussed above, Mr. Keita has been detained since November 2, 2022, and his period of incarceration has been characterized by frequent, protracted lockdowns. Mr. Keita has also been deprived of basic human dignities. During his period of detention, Mr. Keita has not been granted consistent, meaningful access to fundamental facilities like hygienic shelter, showers and bathrooms, let alone the meaningful exercise and rehabilitation programs that are intended to ensure that his confinement is not just punitive, but also safe and rehabilitative. It is a testament to Mr. Keita's character that he has completed courses and worked independently to educate and further himself at the MDC, instead of giving in to the feelings of hopelessness, isolation, and desperation that have plagued him.

KAPLAN HECKER & FINK LLP

As numerous courts in this Circuit have recognized, harsh conditions of pretrial detention—particularly at the MDC—strongly favor the imposition of reduced sentences. *See, e.g.*, *United States v. Rodriguez*, 21 Cr. 155 (JGK) (S.D.N.Y. Jan. 25, 2022), ECF 71 at 12 (imposing below-guidelines sentence where, "[s]ignificantly, the defendant ha[d] spent 10 months in the MDC" and observing that "the conditions in the MDC are particularly difficult"); *United States v. Gonzalez*, 18 Cr. 669 (JPO) (S.D.N.Y. Apr. 2, 2021), ECF 250 at 17-18 (describing the "extraordinarily harsh" conditions of near constant lockdowns in BOP jails as "basically like solitary confinement," and noting that "because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served"); *United States v. Sepulveda*, No. 19 Cr. 229 (PKC) (E.D.N.Y. June 24, 2021), ECF 81 at 29-30.

Indeed, several of the judges in the above-cited cases imposed below-Guidelines sentences based on hardships relating to *general* conditions of detention at the MDC during COVID-19. But it is well documented that due to staffing shortages, the conditions at the MDC have arguably only worsened since the height of the COVID-19 pandemic. *See, e.g.*, *Chavez*, 2024 WL 50233, at *8 n.19 ("The fact that the harsh conditions during COVID-19 have persisted and, in some ways, even worsened makes the present circumstances more 'exceptional,' not less.").[3] In January of this year, Judge Furman wrote extensively about the facility's institutional problems, noting that "[i]t has become common for defense counsel to require court intervention to ensure that inmates receive basic care — and, even more shocking, not uncommon for court orders to go unheeded." *Id.* at *6.

In sum, Mr. Keita's sentence should be meaningfully reduced due to the inhumane and exceptionally difficult nature of his seventeen months of incarceration at the MDC to date. The hardships he has experienced there have meaningfully impacted his mental health—the full extent of which has yet to be determined—and justify a decrease in any term of incarceration imposed by the Court at sentencing in order fairly to account for the punitive conditions Mr. Keita has already endured.

### B. Mr. Keita's Participation in the Offense

Mr. Keita was one of many participants in the offense at issue. While the Government has previously tried to cast Mr. Keita as the mastermind of the conspiracy, the facts show that is simply not true. There is no doubt that Mr. Keita's role in transporting firearms from Arkansas to New York was an important one to the success of the charged offense and reflects a serious violation of the law. But Mr. Keita's role was limited to that of a middleman, working at the behest of purchasers in New York whose conduct thereafter was unknown to Mr. Keita. *See* Sealed Compl. as to Jailyn Hillard, ¶ 8(d) (attesting that the firearms purchased "really [weren't]" for Mr. Keita, that they were "not his to keep" and that he is "sort of a middleman"). Mr. Keita, perhaps naively, did not know where the guns went or what happened to them in New York. His role was limited to facilitating their delivery to others.

---

[3] *See also* Benjamin Weiser, *Judge Refuses to Send Defendant in Drug Case to Troubled Brooklyn Jail*, N.Y. TIMES (Jan. 4, 2024), https://www.nytimes.com/2024/01/04/nyregion/brooklyn-judge-mdc-jail.html.

KAPLAN HECKER & FINK LLP

Although not an excuse, Mr. Keita's environment without question impacted his very poor choices. He had grown up in an environment where guns were commonplace and easy to purchase. *See* Ali Ahmed, *20 States with Most Guns Per Capita*, Yahoo Finance (Aug. 21, 2023), https://finance.yahoo.com/news/20-states-most-guns-per-203058058.html (listing Arkansas as sixth in guns per capita); Christina Capatides, *How heavily armed is your state?*, CBS News (Dec. 4, 2015), https://www.cbsnews.com/pictures/most-heavily-armed-states-in-america/ (listing Arkansas as the third most heavily armed state in America). He frequently used guns as accessories for his music videos and was used to seeing others do the same and otherwise having firearms around. He was naïve, young, looking to earn money to support his growing family, and made some exceptionally bad choices. But that does not change the nature of his role in the offense. Mr. Keita's sentence should reflect his true role as a middleman in the offense, and not credit any suggestion that Mr. Keita was calling the shots or somehow more than a participant, albeit a meaningful one, in a broader course of conduct in which several participants were integral and played a part.

### C. Mr. Keita is Not a Risk for Recidivism and his Personal History and Characteristics Support a Sentence that is Modestly Below the Advisory Guidelines

As a 24-year-old, first-time offender, Mr. Keita's personal history and characteristics independently support a sentence that is modestly below the advisory Guidelines range.

Prior to the instant case, Mr. Keita had three prior arrests, one for shoplifting a cellphone charger at age 18, a second at age 20 for driving with an expired license and registration, and a third, also at age 20, that resulted in a more serious set of charges which remain pending. Specifically, Mr. Keita borrowed a friend's car and was together with another friend driving around in the car and running errands when the police attempted to pull the car over. Mr. Keita knew nothing about how his friend had come into possession of the car, though he now understands that the vehicle had been stolen. And when his other friend who was riding along with him realized that the police were attempting to pull them over, he loudly and emphatically shouted at Mr. Keita to drive away. In a sequence of moments and judgments that he has relived numerous times in the years since, Mr. Keita reflexively responded by driving away at high speed in an effort to evade the police. In doing so, he put numerous innocent people in danger. There is no excuse for his reckless conduct, and Mr. Keita understands that. He understands that he will ultimately have to answer for these pending charges, and he is prepared to do so.

Mr. Keita's choices that led to the charges in the instant case, and that underpin his pending state case, are properly understood as the reckless and naïve choices of a young man who lacked the discipline and focus for hard work, who lacked adult male role models to provide guidance and encouragement at critical moments in his life, and who ultimately gave in to the negative influences with which he was surrounded. Fortunately, Mr. Keita's mistakes in his youth do not define the man that he is capable of becoming, and he is determined to learn from them and move past them.

As described above, and in the letters of support from his family, Mr. Keita's criminal conduct is at odds with the family-oriented young man who is deeply committed to supporting the people he loves. His separation from them, most especially from his now 2-year-old son, has been its own form of harsh and impactful punishment for Mr. Keita. He is ashamed of what he did, and

KAPLAN HECKER & FINK LLP

the fact that he brought pain and sorrow to the people who love him is something Mr. Keita will continue to struggle with whatever the sentence imposed.

Mr. Keita has always sought to look out for his younger siblings, whom he loves wholeheartedly, and to steer them from harm's way. Appreciating the very bad example he set for them, and missing out on the first years of his son's life, are forms of punishment Mr. Keita is presently enduring, and will continue to endure, that greatly militate against any concern or expectation that Mr. Keita will face the criminal justice system in the future. The thought of being out of jail in time to hold his son while he is still a young child, to be there to see him develop in these early years, and to be in attendance at his younger sister's high school graduation, has given Mr. Keita strength through the many tough and lonely days at the MDC. He has every intention of doing everything he can to never make such weighty mistakes again.

\* \* \*

For the above reasons, we respectfully ask the Court to impose a sentence of no more than 24 months' imprisonment. Mr. Keita has already been severely punished by his detention at the MDC. He is a young man for whom this first serious encounter with the criminal justice system has been deeply impactful. Given his personal background and circumstances, his role in the offense, and the factors described herein that meaningfully reduce his risk of recidivism, we submit that a sentence of 24 months' incarceration would be a fair and just sentence that is "sufficient, but not greater than necessary" to achieve the statutory purposes of sentencing.

Respectfully submitted,

Jenna M. Dabbs
Disha Verma
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Telephone: (212) 763-0883
Facsimile: (212) 564-0883
jdabbs@kaplanhecker.com
dverma@kaplanhecker.com

*Counsel for Aboudulaye Keita*

cc: (by ECF)

AUSA Jane Chong